## Grace Williams, Administratrix of the Estate of Gustavis Williams, Deceased, Defendant in Error, v. Saul J. Kaplan, Plaintiff in Error.

### Gen. No. 30,845.

1. HIGHWAYS—*sufficiency of declaration in action for injury by automobile as averment of wilful and wanton negligence.* A declaration in an action for damages resulting from the striking and killing of a pedestrian by defendant's automobile at a street intersection, which alleged that it became the duty of the defendant to so manage, run, operate and drive his automobile at the place in question as not to injure pedestrians crossing the street on which he was driving, but that he nevertheless "so wilfully, wantonly and maliciously ran, managed, operated and drove" his automobile on the street in question "that said automobile without any fault on the part of the deceased, was caused to and did, run into, upon and against the deceased" thereby causing his death, held sufficiently to state a cause of action based upon wilful and wanton negligence.

2. NEGLIGENCE—*elements essential to liability for wilful and wanton negligence.* It is not an essential element of a defendant's liability for wilful and wanton negligence that he shall be made to appear to have known that the victim of his negligence was in a position such that he was likely to be injured, or that defendant intended, as a matter of fact, to injure him.

3. HIGHWAYS—*sufficiency of evidence to support count for wilful and wanton negligence, in action for injury to pedestrian by automobile.* Evidence in an action for damages resulting from the striking and killing of a pedestrian by an automobile at a street intersection held so strongly to support a count for wilful and wanton negligence that the reviewing court would not be justified in setting aside the verdict for plaintiff thereon as against the weight of the evidence.

4. HIGHWAYS—*unavailability of defense of contributory negligence, in action for injury to pedestrian by automobile, where evidence supports count averring wilful and wanton negligence.* Where the declaration in an action for damages for killing a pedestrian with an automobile at a street intersection contains a count sufficiently charging wilful and wanton negligence, and there is evidence supporting a verdict for plaintiff thereon rendered under appropriate instructions, the fact that there may have been evidence tending to show contributory negligence on the part of the

deceased is not material upon the question of the defendant's liability.

5. EVIDENCE—*when witness, in action for injury by automobile, properly asked whether speed of car was fast or slow.* Where a witness had testified, on direct examination in an action for injury by an automobile, that the car was being driven at "a moderate rate of speed," it was not error to permit her to be asked, on cross-examination, whether the driving was fast or slow.

6. EVIDENCE—*propriety of asking witness who testifies indefinitely as to speed of automobile, to state its speed in terms of miles per hour.* Where after a witness in an action for injury by an automobile had testified, in response to a question as to the speed of the automobile at the time of the accident, "I wouldn't call it slow," was asked by the court if he could give the speed of the car approximately in miles, and responded that as near as he could tell it was 25 miles an hour, it was not error to overrule an objection to the question and answer.

7. HARMLESS AND PREJUDICIAL ERROR—*characterization by witness of movement of car as "speeding," where she also stated it in terms of miles per hour.* Defendant in an action for injury by an automobile was not prejudiced by the fact that after the testimony of a witness to the effect that the car "was coming up the hill at a terrific speed" was stricken upon objection, she was permitted to state that it was "speeding up the hill," where she subsequently testified that the car was traveling at a speed of over 30 miles an hour.

8. INSTRUCTIONS—*propriety of instruction purporting to state what declaration averred, but not employing language of pleader.* An instruction undertaking to inform the jury as to what was charged in the declaration held not erroneous where it gave the substance of the allegations of the declaration, although it did not follow the language of the declaration as closely as some instructions of this type do, and although it did not conclude, as it might better have done, by charging the jury that it was their province to determine, from all the evidence, under the court's instructions, whether the plaintiff's case, as so alleged in some of the counts of the declaration, had been made out by a preponderance of the evidence.

9. HIGHWAYS—*propriety of instruction reciting language of statute as to speed of automobiles, in action for injury to pedestrian.* An instruction, in an action for damages for an injury to a pedestrian by an automobile at a street intersection, which recited the statute as to speed, held not erroneous.

10. HIGHWAYS—*accuracy of definition of wilful and wanton negligence in instruction in action for injury by automobile to pedestrian.* An instruction in an action for damages for an injury to a pedestrian by an automobile at a street intersection held properly to have defined wilful and wanton negligence.

11. HARMLESS AND PREJUDICIAL ERROR—*instruction as to elements of damages varying insubstantially from statutory requirements.* Defendant in an action for damages for injury to a pedestrian by an automobile at a street intersection held not prejudiced by an instruction pertaining to the elements of recoverable damages, although it did not accurately follow the exact standard of the statute, where the variance therefrom was obviously insubstantial.

12. HARMLESS AND PREJUDICIAL ERROR—*omission to mark instructions as "Given" before delivery to jury to take to jury room.* Where it is not made to appear in what respect defendant in an action for damages for negligence was harmed by the fact that the instructions of the court were not marked "Given" until after the jury had rendered their verdict, the irregularity was not a ground for reversal of a judgment for plaintiff, where it appeared that the jury heard read all the instructions in fact given, and took them with them to the jury room, and such instructions were thereafter properly marked upon the hearing of the motion for a new trial.

13. DAMAGES—*when verdict for $7,000 not excessive for death of pedestrian killed by automobile.* A verdict for $7,000 for the wrongful death of a mail carrier, 63 years old, who had been receiving an annual salary of $1,800, and who left surviving him a widow, a daughter 30 years old who was a school teacher, and a son 28 years old who had an income of $25 a week, both of such children living with their parents who owned their own home, held not so excessive as to suggest passion or prejudice or that the award was in any degree punitive, so as to warrant the Appellate Court in setting it aside.

Error by defendant to the Superior Court of Cook county; the Hon. CHARLES A. WILLIAMS, Judge, presiding. Heard in the third division of this court for the first district at the March term, 1926. Affirmed. Opinion filed October 13, 1926.

COHEN, TOMAS & COHEN, for plaintiff in error.

JOSEPH E. WINTERBOTHAM, for defendant in error.

MR. PRESIDING JUSTICE TAYLOR delivered the opinion of the court.

On January 31, 1923, Grace Williams, administratrix of the estate of Gustavis Williams, deceased,

brought suit in the superior court against the defendant, Saul J. Kaplan, for damages resulting from an automobile driven by the defendant, striking and killing Gustavis Williams. There was a trial before the court, with a jury, and a verdict and judgment for the plaintiff in the sum of $7,000. This appeal is from that judgment.

The declaration consists of five counts. The first alleges that on December 23, 1922, Williams was a United States mail carrier; that while on that day with all due care and caution for his own safety, he was lawfully crossing on Washtenaw Street where it intersects Diversey Boulevard, it became and was the duty of the defendant to drive his automobile so as not to injure pedestrians; but that the defendant so carelessly drove his automobile in a westerly direction on Diversey Boulevard, that, without the fault of Williams, he ran against and into Williams, injuring him so that he died on the same day. It further alleges that Williams, the deceased, left surviving him, his widow, and a son and daughter, who suffered pecuniary loss by reason of his death, and that the plaintiff, Grace Williams, was appointed administratrix of the estate of her husband, and began suit within one year of his death.

The second count is similar save that the negligence alleged is that the defendant, at the time, was driving his automobile at a speed of 40 miles an hour.

The third count alleges "that the defendant drove his automobile willfully, wantonly and maliciously" and as a result caused the injury.

The fourth count is similar to the first save that it alleges that the neighborhood was a closely built-up residence part of Chicago and that the defendant drove his automobile at a rate of 20 miles an hour, contrary to the statute.

The fifth count is similar to the first, save that it alleges that the defendant drove at a rate of speed in excess of 15 miles an hour, contrary to the statute.

Three occurrence witnesses, William Canty, a chauffeur, Paul Wolfram, a chauffeur, and a bystander, Mrs. H. Freudenberg, testified for the plaintiff. The substance of Canty's testimony is as follows: He was a chauffeur for a teaming company and had been in that occupation from eight to nine years. At the time in question, about noon on December 22, 1922, he was driving a Reo truck north on Washtenaw Street, going about 20 miles an hour and at the time of the accident was about 60 feet from the corner of Diversey Boulevard and Washtenaw Street. When he first saw Williams he was stepping off the curb on the east side of Washtenaw Street, going south. There was a truck, with a canopy, to the east of where Williams came from. Williams had just gotten a few steps from the curb, not quite to the center of the street, when he was hit; that the automobile was going 35 miles an hour. The automobile tossed Williams in the air and when he came down he fell on the front right fender and was carried by the automobile to the curb at the southwest corner of the street. The automobile went 35 feet over the south curb of Diversey Boulevard before it stopped. On cross-examination he testified that there was a truck standing on the northeast corner; that Washtenaw Street is about 60 feet, and Diversey Boulevard about 40 feet wide; that the southeast corner was built up; that he saw the automobile about 10 feet before it hit Williams; that he judged the speed as he crossed the street and from the time Williams was hit. On redirect he testified that the automobile was coming from the east, going west, and when he first saw it, it was east of Washtenaw Street.

The substance of Wolfram's testimony is as follows: On December 22, 1922, he was working as a chauffeur for a teaming company, and had been in that occupa-

tion for six years. When he was at Rockwell Street, driving west, the defendant passed him going about 40 miles an hour or better. From Rockwell Street to Talman Street to Washtenaw Street, all north and south streets crossing Diversey Boulevard, there is a rise of about 25 feet from the depression under the Northwestern viaduct. When he had almost reached Talman Street, he saw Williams' body fly up in the air. At that time the defendant had not slackened his speed. Williams was on the east side of Washtenaw Street about four or five feet north of the south curb. The body flew into the air 25 to 30 feet and fell down and caught between the lamp and the motor, and then, about 20 to 30 feet west of the intersection, fell alongside of the curb, the automobile going over the curb and sidewalk into a lot on top of a big bush about four feet around. The defendant's automobile went about 60 to 70 feet from the curb, until it struck the bush. On cross-examination, he testified that Rockwell Street is two short blocks from Washtenaw Street; that Diversey Boulevard is about 60 feet wide and Washtenaw Street about 52 feet; that he was going about 11 miles an hour when the defendant was going 40, and traveled half a block in the time that the defendant went two blocks; that there was an ice cream truck at the northwest corner of Diversey Boulevard and Washtenaw Street; that he did not see Williams before the accident, did not see him until he flew up in the air; that he did not know in what direction he was going prior to that time; that there is a building at the southeast corner of Diversey Boulevard and Washtenaw Street; that in defendant's automobile there was a woman and three children; that the streets were wet.

The evidence of Mrs. H. Freudenberg is, in substance, as follows: About the time in question, she was walking west on the south side of Diversey Boulevard, and when about 20 feet from Washtenaw Street,

she saw Williams. He was on the northwest corner of the intersection and started to cross over to the south side of Diversey on the west side of the street. He looked east, and got within two feet of the southwest curb. The defendant's automobile was going over 30 miles an hour. It was within 10 feet of her when she first saw it. It struck Williams when he was on the south side of the street. It knocked him up in the air about 15 feet and he came down and was 15 feet west of the west curb line of Washtenaw Street. On cross-examination she testified that she was on the southeast corner at the time of the accident, and that Williams was at the northwest corner; that Williams started across the west side of Washtenaw Street in a southerly direction, and she looked back over her shoulder and saw the automobile coming up Diversey Boulevard between Washtenaw and Talman Streets, about half way; that the accident happened at the southwest corner and not on the east side of the street; that she never had driven an automobile and did not know what a cut-out was, although people had told her the cut-out was open. In the course of her direct examination the following colloquy occurred between the trial judge, the witness and counsel:

"Mr. Winterbotham (counsel for the plaintiff): What, if anything, occurred that attracted your attention?

"A. Why, the machine was coming up the hill there at a terrific speed and the cut-out open.

"Mr. Cohen: I object to the answer and move it be stricken out.

"The Court: The words 'terrific speed.' We do not know what you mean by terrific speed. Tell what it is, as far as you can.

"The Witness: Well, it was speeding up the hill.

"Mr. Cohen: I move that answer be stricken out.

"The Court: Well, let it stand."

In addition to the three occurrence witnesses, the plaintiff called one Gormalley, the police officer who patrolled that particular region. His evidence is in substance as follows: He was called to the place of the accident about five or six minutes after it happened. The defendant was there, and the automobile was standing in the vacant lot—at the southwest corner of Diversey Boulevard and Washtenaw Street. It was 75 feet from the west side of Washtenaw Street, about 40 feet from the curb. There were some bushes there in the vacant lot, about 75 feet from the corner and about 15 feet from the sidewalk. There were some tracks beyond the sidewalk as if the automobile had been wiggling around, and some tracks over the sidewalk into the vacant lot. The temperature that day was about 70 degrees; there was ice and snow on the ground, but there was a thaw and a lot of water. The locality is a residence neighborhood. There is a railroad track at about Talman Street, which is next to Washtenaw Street and the tracks are about 16 feet high over Diversey Boulevard; there is a one story brick factory on the southeast corner of Washtenaw Street and Diversey Boulevard which is 30 feet on Washtenaw and 60 feet on Diversey, and an old frame building on the northeast corner. On the southeast corner there are three or four stores and on the southwest corner a vacant lot. There is an incline of about three feet from the top of Washtenaw Street to the bottom of the Northwestern Railway Company. When he got to the scene of the accident they were just lifting Williams' body. It was then about 60 feet west of Washtenaw and a little to the south of the center of Diversey Boulevard.

At the close of plaintiff's evidence, counsel for the defendant made a written motion to find the defendant not guilty as to the charge made in count three of the declaration. The motion was overruled.

For the defendant four occurrence witnesses testified. One of them was a brother of the defendant; one, a school teacher who was riding in the defendant's automobile, sitting at his right; one, a salesman who, at that time, was on the sidewalk on Washtenaw Street, just south of the southeast corner of the intersection; and one a boy, Lester Bobin, who was riding in the rear of the automobile. The defendant was called to testify for himself, but his testimony was objected to on the ground that he was incompetent, and the objection sustained.

The evidence of the salesman, Ernest Dietel, is in substance as follows: At the time of the accident, he was on the east side of Washtenaw Street south of Diversey Boulevard, about five doors from the corner, walking north. He saw the automobile before the contact, and heard the yell, but did not see Williams struck. He did not see Williams go up in the air, but saw papers flying about. He did not see Williams until after he was lying on the south side of Diversey Boulevard near the curb and about 10 to 15 feet west of Washtenaw Street. As near as he could judge, the automobile was going about 25 miles an hour. It went about 25 feet after it hit him. He found Williams lying in the street. All the corners of the intersection are built up save the southwest, which is a vacant lot. At the northeast corner there was a large bulky truck, a little east of the sidewalk east of the crossing about five or six feet. On cross-examination, he testified that when he first saw the automobile, it was even with the east side of Washtenaw Street; that the contact took place about the center, a little southeast of the center of the intersection; that from the time the automobile struck Williams it, until it stopped at the bush, went about 35 feet.

The brother of the defendant—a boy of 9 years and 3 months old at the time of the accident—testified that the road was wet and bumpy; that when the automobile

was going up the incline the defendant blew the horn; that at the top of Washtenaw Street there was a truck on the right side; that Williams sprang out in front of the truck and the defendant drove to the left and the bag flew up in the air.  On cross-examination he testified that Williams was walking from the north to the south, and was hit when in the middle of Diversey Boulevard.  The boy Bobin, who was also in the automobile, and at the time was 11 years and 3 months old, testified that they were going west and there was a truck on the right-hand side and that Williams started out from the truck, went in front of the automobile and was hit by the right part of the fender; that he saw Williams' mail flying up.

The evidence of Alice Foy, the school teacher who was sitting at the defendant's right, is, in substance, as follows:  They were driving west and when they came to the viaduct, about half a block east of Washtenaw Street, there was no moving traffic, and they were driving at a moderate rate of speed.  She was not able to state in terms of miles at what rate the automobile was going.  The defendant sounded the horn as they started and kept on blowing it until they got to the top.  The top of the incline is about at Washtenaw Street.  She did not see anything except the truck that was parked on the northeast corner.  Williams came from in front of the truck.  She did not see him until he stepped out in front of the truck.  Then the defendant swerved the automobile over to the left to avoid hitting him.  Williams came from the front, saw them coming and then jerked back and then came forward again.  The right side of the automobile struck him.  The mail bag went up in the air.  The automobile was turned to the left and went over the curb into the prairie.  On cross-examination she testified that Williams was at the center line of Diversey Boulevard on the east crosswalk of Washtenaw Street

when he was struck; that the lot at the southwest corner was excavated.

At the close of all the evidence written motions for the defendant that the jury be directed to find the defendant not guilty as to all the counts of the declaration, and that the jury be directed to find the defendant not guilty as to count three of the declaration, were made and overruled. Nine written instructions were given for the plaintiff and eleven for the defendant. At the request of the plaintiff the following interrogatory was given to the jury: "Did the defendant wantonly and willfully propel and operate said automobile in such a manner that it ran into and against the deceased, as alleged in the third count of plaintiff's declaration?" and it was answered by them in the affirmative. After the verdict, motions for a new trial and in arrest of judgment were made for the defendant, and were overruled. At the time when the motion for a new trial was being considered, it was discovered that the written instructions had been given physically to the jury without being marked "Given," and counsel for the defendant took an exception.

It is contended for the defendant that the declaration does not state a cause of action based upon wilful and wanton negligence; that the death of Williams was the result of an unavoidable accident, and would not have occurred if Williams had looked before he undertook to cross the street; that there was no wilful and wanton negligence on the part of the defendant.

The third count of the declaration alleged that it became the duty of the defendant to so manage, run, operate and drive his automobile at the place in question as not to injure pedestrians crossing the street on which he was driving. That properly stated the defendant's duty. It then alleges that nevertheless, "the defendant so willfully, wantonly and maliciously ran, managed, operated and drove a certain automobile, by him driven in a westerly direction on said Diver-

sey Boulevard that the said automobile, without any fault on the part of the deceased, was caused to, and did, run into, upon and against the deceased," so that as a result he was killed. It must be borne in mind that it is not necessary, where a cause of action is based upon a charge of wilful and wanton negligence, even for the evidence to show that the defendant, with malice aforethought, and with premeditation, and with conscious intention, brought about the injuries of the defendant. As the court said in *Bremer v. Lake Erie & W. R. Co.*, 318 Ill. 11: "If there is any evidence in the record fairly tending to show such a gross want of care as indicates a wilful disregard of consequences or a willingness to inflict injury, then it is a question to be determined by the jury whether the negligent conduct of the defendant amounted to wantonness or wilfulness. * * * The gross negligence which will justify the presumption of wilfulness or wantonness is such as to imply a disregard of consequences or a willingness to inflict injury." *East St. Louis Connecting Ry. Co. v. O'Hara,* 150 Ill. 580; *Jeneary v. Chicago & I. Traction Co.,* 306 Ill. 392; *Chicago, B. & Q. R. Co. v. Johnson,* 103 Ill. 512; *Chicago City R. Co. v. Jordan,* 215 Ill. 390; *Neice v. Chicago & A. R. Co.,* 254 Ill. 595; *Lake Shore & M. S. Ry. Co. v. Bodemer,* 139 Ill. 596. It need not be claimed for the plaintiff in such a case that there was a particular intention to injure, but that there was such "wilful and wanton recklessness" as "authorizes the presumption of an intention to injure generally," to use the language of the *Johnson* case, *supra*. In that case the court also said that in negligence merely, "there is no purpose to do a wrongful act or omit the performance of a duty," but that there may be such a dereliction of duty as will furnish evidence of a wilful or wanton act.

In the recent case of *Bremer v. Lake Erie & W. R. Co.,* 318 Ill. 11, Mr. Justice Dunn said: "It is necessary in an action to recover damages for personal in-

juries to allege and prove the existence of a duty on the part of the defendant to protect the person injured from the injury of which he complains, the failure of the defendant to perform that duty and the resulting injury. * * * The plaintiff in error contends that in this case no duty is shown a breach of which was the cause of the injury, and relies upon the proposition that because the deceased was a trespasser, the only duty which the plaintiff in error owed him was to refrain from wantonly or willfully injuring him after his presence in a place of danger was known to the defendant or its servants. In its brief many cases are cited to the proposition that after discovery of the presence of a trespasser, and not until then, it is the duty of a railroad company or its servants to avoid willfully or wantonly injuring such trespasser. The proposition stated is not the law of this State and the cases cited do not support it."

In the same opinion, the court further said, in discussing *Lake Shore & M. S. Ry. Co. v. Bodemer,* 139 Ill. 596: "In the first of these cases (meaning the case just mentioned), the running of a train at a high rate of speed in a crowded city, over street crossings, upon unguarded tracks so connected with the public street and so apparently the continuation of a public street as to be regarded by ordinary citizens as located in a public street, along a portion of such tracks where persons were known to be passing and crossing every day, in violation of a city ordinance as to speed and without warning of the approach of the train by the ringing of a bell, was held to be such gross want of care and regard for the rights of others as to justify the presumption of willfulness." The *Neice* case, *supra,* holds that there is a duty to the general public, even to trespassers. "The duty which a railroad company owes to a trespasser before it has knowledge of his presence or danger is, not to do any wilful or wanton act to injure him." *Bremer* case, *supra.* A *fortiori* in the instant

case, it was not necessary that the defendant should have known that Williams was in such a position that he was likely to be injured. *East St. Louis Connecting Ry. Co. v. O'Hara, supra.* What it is necessary to prove and, therefore, what it is necessary, in substance, to allege in such a case, is stated in the *Bremer* case as follows: "If there is any evidence in the record fairly tending to show such a gross want of care as indicates a wilful disregard of consequences or a willingness to inflict injury, then it is a question to be determined by the jury whether the negligent conduct of the defendant amounted to wantonness or willfulness. * * * An intentional disregard of a known duty necessary to the safety of the person, and an entire absence of care for the life, the person or the property of others, such as exhibits a conscious indifference to consequences, makes a case of constructive or legal wilfulness such as charges the person whose duty it was to exercise care with the consequences of a wilful injury." Not infrequently the law imputes to a wrongdoer an intention which, as a matter of fact, he did not possess, and as Salmond says (Salmond Jurisprudence, 7th ed., p. 397): "The reason for the recognition by the law of such cases of constructive intention, is the expediency of extending to the more serious forms of negligent wrongdoing, the liability or additional liability attached to wilful wrongdoing." In the instant case, therefore, although the defendant may not have known that Williams was in such a position as to be likely to be injured, and had no intention, as a matter of fact, to injure him, such knowledge and such intention, in fact, were not necessary elements of his, the defendant's, liability for wilful and wanton negligence. The conclusion follows, therefore, that the declaration properly stated a cause of action based upon wilful and wanton negligence. In so far as the decision of this court in *Harris v. Piggly Wiggly Stores, Inc.,* 236 Ill. App. 392, is to the contrary, it must

be considered as not to be followed, especially in view of the later decision of the Supreme Court. The *Bremer* case, *supra*. The manifest tendency of the law as shown by the decisions is towards less rigor in the technique of pleading, provided, of course, the defendant's rights are not thereby endangered or impaired.

As to the merits of the case, the evidence of wilful and wanton negligence is so strong that we feel bound to let the verdict stand. If an automobile is driven over a street crossing into an intersection of two city streets, in a residence district, at 30 miles or more an hour (here the two chauffeur-witnesses put the speed at 35 and 40 miles an hour, respectively, and Mrs. Freudenberg at over 30), especially bearing in mind the greater care required at the street crossing (*Heidenreich v. Bremner*, 260 Ill. 439), and the maximum speed fixed by the statute for such areas is 15 miles an hour, it seems to be, at the very least, reasonable—to use the language of the decisions—to infer an intended disregard of a known duty necessary for the safety of others, and a want of care for the life of others, and shows such a conscious indifference to consequences as to justify and establish a charge of constructive or legal wilfulness. The *Jeneary* case, *supra*.

The evidence here tends to show that Williams was doing his duty as a mail carrier, and was walking south on the street crossing, or some short distance to the west of it, and that he looked east—such is the uncontradicted testimony of Mrs. Freudenberg—that he was in the exercise of ordinary care, and that the defendant drove at a speed, which in and of itself, considering the circumstances and the situation at the time, was obviously unreasonable, and in violation of the statute. And such being the situation of fact, as disclosed by the record, and as it was the duty of the defendant, as a matter of law, as he approached the street crossing located in a residence area, to exercise appropriate care, both as to speed and as to persons

who might be in the act of crossing, it follows, in our judgment, that we would not be justified in overriding the verdict of the jury as being clearly against the weight of the evidence.

It is contended that there was evidence tending to show that Williams was guilty of contributory negligence. But that, in view of the evidence as to wilful and wanton negligence, becomes immaterial. The declaration having sufficiently charged wilful and wanton negligence, and substantial evidence tending to show wilful and wanton negligence having been introduced, and the jury having been properly instructed on that subject, the evidence as to the conduct of Williams in no way relieves the defendant of liability.

Objection is made that the trial judge erred in ruling on certain questions propounded to defendant's witness, Foy. She had already been allowed on direct examination to testify that the defendant was "driving at a moderate rate of speed." Apparently, that was as definite a judgment as she could give. And so when asked whether the driving was fast or slow, the question called for no more than she had already given. As to the objection to the ruling when Dietel testified, it is untenable. The trial judge asked the witness, after he stated, "I wouldn't call it slow," if he could give it approximately, in miles, and the witness answered that as near as he could tell it was about 25 miles. That was entirely proper. The court sought the concrete truth and the witness reduced his former vague expression, "ordinary speed" to the more comprehensible one, of "about twenty-five miles an hour." Nor do we find any serious error in the rulings when Mrs. Freudenberg was testifying. It is true that she said the automobile was "coming up the hill there at a terrific speed"; but that the trial judge struck out the phrase, and although she also testified that "it was speeding up the hill," she stated later in her testimony that it was going over 30 miles an hour.

It is contended that the plaintiff's first instruction, which undertook to instruct the jury as to what was alleged in the declaration, constituted error justifying a reversal of the judgment. *Attabella v. Krzepton,* 233 Ill. App. 320. This instruction briefly gave the substance of the allegations of the plaintiff as set forth in her declaration. It did not follow the language of the declaration closely as some instructions of this type do. While the instruction might better have concluded by telling the jury that it was their province to determine from all the evidence, under the court's instructions, whether the plaintiff's case, as so alleged in some one of the counts of her declaration, had been made out by a preponderance of the evidence, we do not consider it error for the court to have given it in the form complained of. It is, also, contended that the plaintiff's second instruction, which recites the statute as to speed, constituted error. Obviously, that objection is not tenable. As to the objection to plaintiff's third instruction, we have already stated that the third count of the declaration set forth a cause of action, and it follows that the instruction, defining quite accurately, as it did, the phrase, wilful and wanton negligence, was entirely proper. It is argued that the instruction is a general one and "disregards the proposition that the defendant must know of the situation of plaintiff's intestate before he can be charged with wilful and wanton misconduct." As we have already stated, there is no such law.

It is contended that plaintiff's fourth instruction which pertains to the assessment of damages, and what may be included therein, is erroneous. The instruction does not accurately follow the exact standard of the statute, but the variance is quite obviously insubstantial.

It is further contended that as the instructions were not marked "Given" until after the jury had rendered its verdict, the omission constituted error suf-

ficient to justify a reversal. It was irregular, but as all the instructions the jury heard read and which were delivered to them were, of course, the ones that were "Given" and so marked afterwards, upon the hearing of the motion for a new trial, we do not see, and it is not pointed out, how the omission could have deprived the defendant of any right or caused him any harm.

It is further contended that the damages are excessive. At the time of his death, Williams was 63 years old, a mail carrier, with an annual salary of $1,800. He left a widow, a daughter 30 years of age who was a school teacher, and a son 28 years of age, who received $25 a week. Both children lived with their parents, who owned their home. The statute provides that "the jury may give such damages as they shall deem a fair and just compensation with reference to the pecuniary injuries resulting from such death to the wife and next of kin * * * not exceeding $10,000.00." Of course, it is not possible to make a scientific appraisement of "the pecuniary injuries." But that is not essential. The legislature has empowered the jury to name a sum which it considers fair under the circumstances. They have done so, and, considering the verdict of $7,000 and what the pecuniary situation of the widow and next of kin was at the time of William's death, we do not feel entitled to override it. The amount does not in any way suggest passion or prejudice or that it was in any way punitive. *Northern Trust Co. v. Grand Trunk Western R. Co.*, 207 Ill. App. 11; *Moore v. Bloomington, D. & C. R.*, 215 Ill. App. 546.

Finding no error in the record, the judgment will be affirmed.

*Affirmed.*

O'CONNOR and THOMSON, JJ., concur.